UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| CATHERINE Y. GOULD,<br>Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 16-004S |
| | : | |
| CAROLYN W. COLVIN, ACTING<br>COMMISSIONER OF SOCIAL SECURITY,<br>Defendant. | : | |

**REPORT AND RECOMMENDATION**

PATRICIA A. SULLIVAN, United States Magistrate Judge.

This matter is before the Court on the Motion of Plaintiff Catherine Y. Gould for reversal of the decision of the Commissioner of Social Security (the "Commissioner"), denying Disability Insurance Benefits ("DIB") under 42 U.S.C. § 405(g) of the Social Security Act (the "Act"). After two hearings on her application, Plaintiff contends that the Administrative Law Judge ("ALJ") erred at Step Five by improperly including in his decision cleaning jobs that the Vocational Expert ("VE") at the second hearing had testified would be foreclosed and by failing to ask the VE at either hearing to list specific job codes so that the Court could consider whether the Plaintiff was denied disability benefits based on the supposed ability to perform work actually beyond her intellectual capacity. Defendant Carolyn W. Colvin ("Defendant") has filed a motion for an order affirming the Commissioner's decision.

The matter has been referred to me for preliminary review, findings and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Having reviewed the entire record, I find that the ALJ's Step Five error in referring to cleaning jobs is harmless and that Plaintiff waived her job code challenge based on her attorney's failure to ask either VE to provide them. Otherwise, the ALJ's findings are well supported by substantial evidence. Therefore, I recommend that

Plaintiff's Motion to Reverse the Decision of the Commissioner (ECF No. 12) be DENIED and Commissioner's Motion to Affirm Her Decision (ECF No. 14) be GRANTED.

## I. Background

Plaintiff is an individual of "advanced age" in Social Security parlance. Tr. 80. She was fifty-five when she stopped working because of increasing depression, which she claims caused her to take early retirement from her two-year-long job as a school crossing guard; she was sixty at the time of the ALJ hearing. Tr. 62-64. Prior to working as a crossing guard, she worked as a teaching assistant for seventeen years, stopping only when an associate's degree requirement was imposed and she twice failed to pass the test. Tr. 63, 336. Until she retired in 2009, over the course of many years, she was employed, typically earning more than $10,000, as much as $25,000, year over year.[1] Tr. 198. She has a tenth grade education and tried to get her GED when she was much younger, but was unable to do so. Tr. 62-63. At an earlier stage of her life (over thirty years ago), she was in an abusive marriage, suffered from anxiety and was hospitalized at a psychiatric hospital. Tr. 335.

Plaintiff alleges that she became disabled on February 2, 2009, when she retired due to increasing depression. Tr. 64. However, the record is devoid of evidence of any medical treatment from February 2009 until a year later, when she began treating with a primary care physician, Dr. Dennis Botelho. Tr. 299. Over the course of several years, Dr. Botelho noted depression and anxiety, prescribed medication, such as Prozac, but provided no other mental health-related treatment. Tr. 276-332, 346-51, 364-80, 385-90. Dr. Botelho recorded periodic mental status observations that were almost always normal, except for occasional findings of depressed and anxious mood. E.g., Tr. 299 (February 24, 2010: "Alert and oriented to person place and time . . . Judgement and insite nl. Memory nl. Mood nl. No SI."); Tr. 346 (May 28,

[1] Between 1989 and 2009, Plaintiff's income dropped below $10,000 only once. Tr. 198.

2013: "Alert and oriented to person place and time . . . Judgement and insite nl. Memory nl. Mood nl."). Also during this period, Plaintiff testified that she received counseling at Gateway, but when asked to produce records, Gateway reported that no records were located. Tr. 343.

The first record reference to contact with a mental health provider during the period of disability is immediately after Plaintiff applied for disability; in November 2012, psychologist Dr. Danielle DeSantis performed an initial behavioral assessment and noted diagnoses of depression and anxiety. Dr. DeSantis apparently saw Plaintiff for only one more appointment in December 2012 although the record seems to reflect Plaintiff's responses to a series of questions and does not indicate if treatment was provided. Tr. 394-98. In 2013, Plaintiff finally began to receive mental health treatment with Integrated Psychiatry, Inc. Tr. 355. At intake on March 22, 2013, she told the examiner that her social security disability application was pending and that she believed she could not work. Id. The initial psychiatric evaluation resulted in a diagnosis of depression and the finding that her Global Assessment of Functioning ("GAF") score was 70,[2] Tr. 358, reflective of "some mild symptoms" or "some difficulty in functioning" but "overall functioning pretty well," DSM-IV-TR at 34. Although counseling was recommended, Plaintiff declined to follow up because it had not helped in the past. Tr. 65. There are no psychiatric hospitalizations during the period of alleged disability. Tr. 335. No treating source opined regarding Plaintiff's functional limitations. There is no reference in any treating source record to intellectual or cognitive impairment.

---

[2] GAF scores are based on the scale in general use prior to 2014. See Diagnostic and Statistical Manual of Mental Disorders, Text Revision 32–34 (4th ed. 2000) ("DSM–IV–TR"). The most recent update of the DSM has eliminated the GAF scale because of 'its conceptual lack of clarity . . . and questionable psychometrics in routine practice.'" Santiago v. Comm'r of Soc. Sec., No. 1:13-CV-01216, 2014 WL 903115, at *5 n.6 (N.D. Ohio Mar. 7, 2014) (citing Diagnostic and Statistical Manual of Mental Disorders at 16 (5th ed. 2013) ("DSM–5")). Nevertheless, adjudicators may continue to receive and consider GAF scores. SSA Admin. Message 13066 at 2-6, available at http://www.nysba.org/WorkArea/DownloadAsset.aspx?id=51489 (starting at p.19 of PDF document) (viewed Jan. 25, 2017).

In her disability application, Plaintiff claimed that she is impaired by depression, anxiety, heart problems, one-eye blindness, high blood pressure and thyroid problems. Tr. 80. Based on the record, the ALJ found that depression, anxiety and left-eye blindness are severe; he also found that asthma and borderline intellectual functioning amount to severe impairments. Tr. 18. These findings are not disputed.

## II. The Opinion Evidence, the ALJ's Decision and Plaintiff's Claim

On March 19, 2013, Plaintiff was examined by a state agency psychologist, Dr. Jorge Armesto, who performed cognitive and achievement testing, in addition to a mental status examination and a clinical interview. Tr. 335-40. His test results yielded "borderline" and "extremely low" scores with achievement between second and fourth grade, placing Plaintiff on the cusp between borderline intellectual functioning and mild mental retardation. Tr. 336-39. Nevertheless, based on her clinical presentation, Dr. Armesto did not diagnose mild mental retardation. Rather, he found borderline intellectual functioning. Tr. 340. He also diagnosed depression and panic disorder; unlike the treating source evaluation performed three days later (which assessed a GAF of 70), Dr. Armesto assigned a GAF of 48, indicative of serious symptoms or serious impairment in functioning. Id.; see DSM-IV-TR at 34. His report notes: "Claimant's ability to sustain attention, concentrate, and exert mental control is in the extremely low range. . . . Claimant may have difficulties on tasks that require high levels of focus and attention." Tr. 340. The ALJ afforded significant probative weight to Dr. Armesto's report. Tr. 24.

Two Social Security Administration ("SSA") expert psychologists reviewed Dr. Armesto's report, together with the balance of the record; specifically noting his findings and test results, they found that Plaintiff's depression, anxiety and borderline intellectual functioning

were "severe" impairments, but that they caused only moderate impact on her ability to function. Tr. 85, 98. Both found that her intellectual and attentional impairments did not significantly limit her ability to perform simple work: "[s]he will be able to conc/attn/pace for simple, untimed tasks, performed in isolation or superficial contact with others. With these restrictions, she will be able to sustain attn/conc/pace for 2/8/40 schedule, with normal supervision." Tr. 87, 100. The ALJ afforded significant probative weight to the second of the opinions of the SSA psychologists and did not separately consider the first, which is substantially identical. Tr. 24.

To assist with the evaluation of the evidence, the ALJ called as a testifying expert psychologist Dr. Norman F. Baldwin. Dr. Baldwin agreed with the diagnoses of mood disorder and borderline intellectual functioning, as well as with Dr. Armesto's rejection of mild mental retardation. Tr. 56-57. When asked to provide his "B" criteria assessments, Dr. Baldwin opined to moderate or less than marked limitations in all spheres, except for "concentration, persistence, and pace, I would say it's marked." Tr. 57-58. When asked to explain this aspect of his opinion, Dr. Baldwin clarified that limitations in the ability to maintain concentration, persistence and pace would impair Plaintiff's ability to perform complicated tasks, but would not significantly impact her ability to perform an uncomplicated work task: "I would say for uncomplicated repetitive tasks, I don't know that she would meet a listing or be at a marked level." Tr. 59. Dr. Baldwin confirmed this opinion: "I believe she would be capable of maintaining concentration[,] persistence, and pace for tasks that were not complex and were not high pressure not required completion in a short time frame." Id. On cross examination, Dr. Baldwin was asked to focus on Plaintiff's fear of crowds and panic attacks; he opined, "I'm not persuaded that interpersonally she's so impaired that she couldn't hold certain types of competitive positions." Tr. 61.

Because of the reference to asthma and other non-mental health conditions in the medical record, the ALJ convened a supplemental hearing. This time he called a physician with expertise in pulmonology, Dr. John Pella. Dr. Pella testified that Plaintiff suffers from a recurrent hive disorder and has a history of asthma. Tr. 36-38. Based on his review of the treating record, Dr. Pella confirmed that neither of these conditions, nor Plaintiff's heart issues nor her claim of blindness in one eye appear to present significant problems. Tr. 38. Nevertheless, based on the diagnoses of hive disorder and asthma, he recommended environmental restrictions and, based on the claim of blindness in one eye, he recommended limitations for eye protection and depth perception, but no exertional limitations. Id.

At each of the two hearings, the ALJ took testimony from two different VEs. At the first hearing, the VE was asked to opine about an individual with an RFC[3] permitting "uncomplicated work up to several steps" and breaks every two hours, with limited interaction with the public, coworkers or supervisors. In response, the VE testified that Plaintiff could not perform her past relevant work, but she could perform unskilled medium or light level general factory work jobs, including assembler, inspector and packager. Tr. 73. The VE provided the number of such positions in the national and local economies. Tr. 73-74. In addition, the VE testified that such a person could perform light and medium general cleaning work and separately provided the number of positions for such work. Tr. 74. The VE confirmed that these answers were consistent with the information in the Dictionary of Occupational Titles and Selected Characteristics of Occupations (rev. 4th ed. 1991) ("DOT"), as well as with his knowledge of the regional labor market. Tr. 74-75. The VE was not asked by either the ALJ or by Plaintiff's

[3] "RFC" refers to "residual functional capacity." Residual functional capacity is "the most you can still do despite your limitations," taking into account "[y]our impairment(s), and any related symptoms, such as pain, [that] may cause physical and mental limitations that affect what you can do in a work setting." 20 C.F.R. § 404.1545(a)(1).

counsel to provide specific DOT code numbers for these jobs; accordingly, he did not provide them.

During the supplemental hearing, a different VE testified. When asked the same hypothetical as the first VE, he endorsed the opinions of the first VE in all respects. Like the first VE, he was not asked to list the DOT code numbers for either the factory jobs or the cleaning work and did not do so. The ALJ then asked him to consider two additional limitations based on Dr. Pella's testimony regarding asthma, recurrent hives and one-eye blindness:

> The hypothetical claimant would not be able to work where she would be exposed to concentrated levels of dust, fumes, gases or other airborne pulmonary irritants. And would not be able to perform work that requires stereoscopic, that is, binocular vision.

Tr. 42-43. The VE testified that these limitations would not affect the availability of any of the factory work, including the jobs of the assembler, inspector and packager. Tr. 43. He also initially opined that the cleaning work would remain intact because such work typically involves the use of non-toxic cleaning solutions and the vacuuming of dust and other irritants. Id. When pressed by the ALJ, he agreed, "to be safe, let's say they wouldn't be able to do those jobs." Id.

Based on this evidence, at Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity since onset; at Step Two, he found severe impairments of anxiety, depression, borderline intellectual functioning, asthma and left-eye blindness; at Step Three, he ruled out any Listings; and, before proceeding to Step Four, he opined that Plaintiff had the RFC to:

> perform a full range of work at all exertional levels but with the following limitations: [Plaintiff] is able to maintain concentration and attention sufficient to perform uncomplicated work tasks of up to several steps over an eight hour work day, assuming short work breaks on average every two hours, and no unusual time pressure constraints. She is able to interact with the public on an occasional basis, provided interaction does not require more than exchange of non-personal work-related information or hand-off of products or materials; can work in the

> presence of co-workers and engage in appropriate occasional social interaction, but cannot work in the context of a work team where work-related interaction with co-workers is constant and physically close; and can deal appropriately with supervisors on an occasional basis, but not in circumstances in which monitoring and intervention by supervisors is physically close and/or frequent or continuous. [Plaintiff] is unable to work where she would be exposed to concentrated levels of dust, smoke, gases, or other pulmonary irritants. Finally, [Plaintiff] is unable to perform work that requires stereoscopic/binocular vision.

Tr. 18-20. With this RFC, the ALJ ruled out past relevant work at Step Four and proceeded to Step Five. Tr. 24. At Step Five, in reliance on the testimony of both VEs, the ALJ's decision states that Plaintiff's RFC permits her to perform "medium – factory assembly, inspection and packing," as well as "light – cleaning," both of which exist in significant numbers in the national and regional economies. Tr. 25. Therefore, he concluded that Plaintiff was not disabled at any relevant period. Tr. 26; see also 20 C.F.R. § 404.1566(b) ("[I]f work that you can do . . . exist[s] in the national economy, we will determine that you are not disabled.").

## III. Issues Presented

Plaintiff's motion for reversal rests on two arguments: first, that the ALJ erred at Step Five by improperly relying on the finding that Plaintiff could perform cleaning work, which had been specifically ruled out by the second VE's testimony; and, second, that the ALJ's failure to ask the VE for DOT numbers requires remand to develop the record.

## IV. Standard of Review

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla – that is, the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam); Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981); Brown v. Apfel, 71 F.

Supp. 2d 28, 30 (D.R.I. 1999). Once the Court concludes that the decision is supported by substantial evidence, the Commissioner must be affirmed, even if the Court would have reached a contrary result as finder of fact. Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987); see also Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991); Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981).

The determination of substantiality is based upon an evaluation of the record as a whole. Brown, 71 F. Supp. 2d at 30; see also Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987); Parker v. Bowen, 793 F.2d 1177, 1180 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied). Thus, the Court's role in reviewing the Commissioner's decision is limited. Brown, 71 F. Supp. 2d at 30. The Court does not reinterpret the evidence or otherwise substitute its own judgment for that of the Commissioner. Id. at 30-31 (citing Colon v. Sec'y of Health & Human Servs., 877 F.2d 148, 153 (1st Cir. 1989)). "[T]he resolution of conflicts in the evidence is for the Commissioner, not the courts." Id. at 31 (citing Richardson v. Perales, 402 U.S. 389, 399 (1971)). A claimant's complaints alone cannot provide a basis for entitlement when they are not supported by medical evidence. See Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 20-21 (1st Cir. 1986); 20 C.F.R. § 404.1529(a).

## V. Disability Determination

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 416(I); 20 C.F.R. § 404.1505. The impairment must be severe,

making the claimant unable to do previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-1511.

The ALJ must follow five steps in evaluating a claim of disability. See 20 C.F.R. § 404.1520. First, if a claimant is working at a substantial gainful activity, the claimant is not disabled. 20 C.F.R. § 404.1520(b). Second, if a claimant does not have any impairment or combination of impairments that significantly limit physical or mental ability to do basic work activities, then the claimant does not have a severe impairment and is not disabled. 20 C.F.R. § 404.1520(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Appendix 1, the claimant is disabled. 20 C.F.R. § 404.1520(d). Fourth, if a claimant's impairments do not prevent doing past relevant work, the claimant is not disabled. 20 C.F.R. § 404.1520(e)-(f). Fifth, if a claimant's impairments (considering RFC, age, education and past work) prevent doing other work that exists in the local or national economy, a finding of disabled is warranted. 20 C.F.R. § 404.1520(g). Significantly, the claimant bears the burden of proof at Steps One through Four, but the Commissioner bears the burden at Step Five. Wells v. Barnhart, 267 F. Supp. 2d 138, 144 (D. Mass. 2003) (five step process applies to both DIB and SSI claims). That is, once the ALJ finds that a claimant cannot return to the prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the local or national economy. Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001). To meet this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant. Allen v. Sullivan, 880 F.2d 1200, 1201 (11th Cir. 1989).

## VI. Application and Analysis

### A. ALJ's Error in Referring to Cleaning Jobs

Plaintiff is correct that the ALJ was plainly in error when he incorporated into his decision the finding that Plaintiff could perform light cleaning jobs; it obviously conflicts with the testimony of the second VE. The testimony in question – "to be safe, let's say they wouldn't be able to do those jobs" – was solicited by the ALJ himself, who pressed the VE on the impact of cleaning on someone with asthma, including the use of cleaning fluids and the stirring up of dust and irritants. Tr. 43. The flaw in the argument arising from this mistake is that the error is plainly harmless, no matter how the Court analyzes it. White v. Colvin, No. CA 14-171 S, 2015 WL 5012614, at *6 (D.R.I. Aug. 21, 2015) ("If the likely outcome on remand is clear and the same as that reached by the ALJ, the error is harmless and the court may uphold the denial of benefits."); Rivera v. Comm'r of Soc. Sec., Admin., Civil No. 12-1479(BJM), 2013 WL 4736396, at *11 (D.P.R. Sept. 3.2013) ("[A]n ALJ's error is harmless where it is 'inconsequential to the ultimate nondisability determination.'") (quoting Molina v. Astrue, 674 F.3d 1104, 1115 (9th Cir. 2012)) (alteration in original).

For starters, the phrase in the ALJ's decision that refers to cleaning jobs appears to be an obvious scrivener's mistake. See Tr. 25. The ALJ clearly was aware that Plaintiff had environmental restrictions potentially affecting her ability to work as a cleaner. Indeed, that issue appears to be a principal reason for holding the supplemental hearing. During the first hearing, the first VE had testified that the factory jobs would be available at both the light level, with 4,000/800,000 (regional/national) jobs, and at the medium level, with 2,000/400,000 (regional/national) jobs. Tr. 74. The first VE also testified that cleaning jobs would be available at both levels, but in different numbers. According to the testimony, the light level cleaning jobs numbers were 2,000/5,000,000, and the medium level cleaning jobs numbers were 4,000/1,500,000. During the second hearing, the second VE affirmed the factory jobs, but

testified that the cleaning jobs were precluded. Id. The ALJ's decision clearly expresses the intent to rely on all of this VE testimony. Tr. 25.

Consistent with this intent, the first part of the sentence containing the finding of available work accurately reflects the first VE's testimony regarding available medium level factory work: "medium – factory assembly, inspection and packing (2,000 and 400,000)." Id. After that, the sentence seems to go haywire. First, it inexplicably omits the testimony that light factory work would also be available. Tr. 74 ("At the light level factory . . . [i]n Rhode Island 4,000 . . . Nationally 800,000."). Second, it materially misstates the VE's testimony about the number of light cleaning jobs. The ALJ's decision states, "light – cleaning (4,000 and 1,200,000)," Tr. 25, but the first VE testified that the number of light regional cleaning jobs is 2,000, not 4,000, Tr. 74. What the ALJ wrote for the number of light regional cleaning jobs makes sense if the phrase relates to the number of light regional factory jobs, which is one of the data points that is mysteriously missing. Similarly, the reference to 1,200,000 light cleaning jobs in the national economy makes no sense at all in that such a number is not reflected anywhere in either VE's testimony in regards to cleaning work; however, "1,200,000" does coincide precisely with the total number of factory jobs in the national economy at the light (800,000) and medium (400,000) levels. In short, when the ALJ's sentence is read carefully in light of the testimony on which it is based, it compels the conclusion is that this is the error of an editor who mistakenly deleted and altered text plainly intended to correspond to the first VE's finding regarding available factory work and the second VE's testimony about the unavailability of cleaning work. Under such circumstances, the obvious mistake in translating the VEs' testimony accurately into the decision is a scrivener's error that does not require remand. See Hudon v. Astrue, Civil No. 10-cv–405-JL, 2011 WL 4382145, at *4 (D.N.H. Sept. 20, 2011) (scrivener's error does not

require reversal where ALJ's intent is apparent) (citing Douglas v. Astrue, C/A No. 1:09-1349-CMC-SVH, 2010 WL 3522298, at *3-5 (D.S.C. Sept. 3, 2010) (collecting cases)); see also Cruz o/b/o Fonseca v. Colvin, C.A. No. 14-526ML, 2016 WL 1068860, at *10 (D.R.I. Feb. 18, 2016), adopted sub nom., Cruz v. Colvin, CA 14-526 ML, 2016 WL 1069059 (D.R.I. Mar. 17, 2016) (same).

Alternatively and equally compelling, I find that the error in mentioning cleaning work is nevertheless harmless if even the Court assumes the ALJ intended to commit so obvious an error. Using this approach, the Court is limited to the medium factory jobs that the ALJ listed in the decision (2,000/400,000), and must ignore the VE's testimony establishing that a significant number of light factory jobs are also available to Plaintiff. See Tr. 25. Even with this limitation, the number of available jobs is far beyond what courts consider to be significant. See Connor v. Colvin, No. 14-40163, 2016 WL 4358117, at *9 (D. Mass. Mar. 31, 2016) (finding that 130,000 jobs in the national economy and 1,300 in local economy was "significant"); Dashnaw v. Astrue, Civil No. 10-cv-456-SM, 2011 WL 5040708, at *6 (D.N.H. Oct. 24, 2011) (100 regional jobs and 30,000 jobs in national economy is "significant" because Act requires focus on national number). Thus, the available medium factory work mentioned in the decision, by itself, is sufficient to carry the ALJ's Step Five burden. 20 C.F.R. § 404.1566(b) ("Work exists in the national economy when there is a significant number of jobs (*in one* or more occupations) . . . .") (emphasis added); see also Evans v. Colvin, 640 F. App'x 731, 736 (10th Cir. 2016) ("an ALJ's erroneous inclusion of some jobs [is] harmless error where there remained a significant number of other jobs in the national economy"); Thomas v. Comm'r of Soc. Sec., 497 F. App'x 916, 920 (11th Cir. 2012) (same); Allison v. Astrue, 425 F. App'x 636, 640 (9th Cir. 2011) (same); Connor v. Colvin, No. 14-40163, 2016 WL 4358117, at *9 (D. Mass. Mar. 31, 2016) (same).

Based on the foregoing, I recommend that this Court find the ALJ's reference to cleaning jobs was harmless error and does not require that the matter be remanded.

**B. ALJ's Failure to Ask for DOT Numbers**

Plaintiff's secondary argument is based on the ALJ's failure to elicit testimony regarding the specific DOT numbers that correlate to the light and medium factory (assembly, inspection and packing) jobs that both VEs said she could do. The conclusion that this is error requiring remand sits atop a speculative house of cards. Thus, to prevail on this point, Plaintiff asks the Court to assume that her severe intellectual deficits might impact adversely her ability to perform jobs that require "Reasoning level 2" or more,[4] and, if so, to speculate that the factory jobs to which the VEs both opined might be unavailable in that they might require "Reasoning level 2" or more. She seeks a remand to explore the possibility that both of these propositions are true. If they are, the finding of no disability is tainted because Plaintiff lacks the intellectual capacity to perform the work on which the ALJ relied.

Plaintiff's reasoning begins with the speculation that Dr. Armesto's report might be interpreted as evidence of intellectual and attentional limitations so severe as potentially to limit her to "Reasoning Level 1." The problem with this first leg in Plaintiff's analysis is that the SSA psychologists and Dr. Baldwin all deployed their expertise to interpret Dr. Armesto's report and none opined to such a limitation, nor did Dr. Armesto state any such conclusion. The second proposition that Plaintiff urges the Court to consider is that Dr. Baldwin testified to "marked" limitations in the ability to maintain concentration, persistence and pace; therefore, Plaintiff contends, the Court should speculate that Plaintiff has greater intellectual deficits so that her

[4] According to the DOT, "Reasoning level 2" requires the ability to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations." DOT, Appendix C, § III. It is unclear whether any of the factory or cleaning jobs identified by the VEs cannot be performed by an individual limited to "Reasoning level 1." The applicable DOT codes for each job would permit an analysis of what "Reasoning level" is the minimum required for each job.

reasoning capacity might not permit her to function above "Reasoning level 1." The problem is the same as with Plaintiff's reliance on Dr. Armesto because Dr. Baldwin was asked to and did clearly explain his opinion that Plaintiff can perform uncomplicated work. The ALJ's RFC finding tracks Dr. Baldwin's opinion in that he found "marked" difficulties with concentration, persistence and pace for the "B" criteria analysis, but also concluded that Plaintiff was capable of uncomplicated repetitive work that does not impose high pressure. Dr. Baldwin did not opine to further cognitive or intellectual limitations. Tr. 58-59. Most importantly, at the hearing, Plaintiff did not ask, and Dr. Baldwin did not testify, that Plaintiff is intellectually limited to "Reasoning level 1." Now on appeal, Plaintiff points to nothing beyond speculation to buttress the proposition that she cannot reason at "Reasoning level 2 or more."

As to the second proposition (that factory work might require at least "Reasoning level 2" capacity), Plaintiff concedes that the Commissioner can meet her Step Five burden "of coming forward with evidence of specific jobs in the national economy that the applicant can still perform," Seavey, 276 F.3d at 5, without presenting testimony regarding the specific DOT code numbers. Edwards v. Sec'y of Health & Human Servs., 34 F.3d 1065, 1994 WL 481140, at *3 (1st Cir. Sept. 2, 1994) (per curiam) (unpublished table decision). Instead, she points to two decisions that she contends support the conclusion that the failure to supply the specific DOT codes amounted to legal error. Eaton v. Barnhart, No. 04-84-B-W, 2005 WL 1168460 (D. Me. Mar. 14, 2005); Anschutz v. Barnhart, 212 F. Supp. 2d 1077, 1085-1086 (S.D. Iowa 2002). These cases do not advance her cause. Eaton did not deal with the mere failure to ask for the DOT codes; rather, it involved several specific and demonstrable discrepancies between the VE's testimony and the DOT job descriptions for the jobs on which the ALJ relied. 2005 WL

1168460, at *3-4. Anschutz is equally inapt – it deals with a VE who did not rely on the DOT at all. 212 F. Supp. 2d at 1085-1086.

For applicable controlling authority this Court need look no further than to our own Circuit. In Edwards, the First Circuit addressed a more serious potential error arising from the lack of DOT job codes than the issue presented here. 1994 WL 481140, at *3-4. The Edwards VE had testified only to job titles, neither the ALJ nor claimant's counsel asked for DOT job codes and, on appeal, the claimant pointed to specific DOT job descriptions by reference to the codes for each and argued that the only jobs that fit the VE's job titles required the ability to do more than sedentary work, which the claimant could not do. Id. at *2-3. The First Circuit noted that such "uncertainty . . . might cause concern," in that "[a] clear dichotomy between the DOT and the VE's testimony on this point may call into question the sufficiency of the Secretary's evidence." Id. at *3. Nevertheless, it rejected the argument because, "not only is the alleged DOT contradiction uncertain, but the circumstances surrounding the claimant's failure to object at the hearing suggest that this uncertainty is better explained by hindsight interpretation than by actual error." Id. The fact that Plaintiff was represented at the hearing by an attorney who failed to ask for the specific DOT codes clinched it. With no good excuse for the failure to raise the matter at the hearing, the judgment below was affirmed. Id. at *4.

Edwards applies with even more force here. Plaintiff presents no "clear dichotomy" between the DOT and the VEs' testimony – instead, she relies on little more than unfounded speculation. Further, Plaintiff passed up not one, but two chances to ask a VE to provide the DOT numbers. The failure to do so at either hearing waives her right to raise the issue now. See Mills v. Apfel, 244 F.3d 1, 8 (1st Cir. 2001) ("no-waiver approach . . . at the ALJ level . . . could cause havoc, severely undermining the administrative process"); Majors v. Colvin, No. 12-

40166, 2014 WL 551019, at *9 (D. Mass. Feb. 7, 2014) (failure of plaintiff's counsel to question VE about specific DOT numbers is waiver); Marques v. Astrue, No. 10-11813, 2012 WL 925710, at *10 (D. Mass. Mar. 6, 2012) ("because [plaintiff's] attorney was given an opportunity to cross-examine the vocational expert and neglected to raise the objection, [plaintiff] is barred from raising it at trial"); Stepinski v. Astrue, No. 11-183, 2012 WL 3866678, at *10 (D.R.I. Aug. 6, 2012), adopted, 2012 WL 3863812 (D.R.I. Sept. 5, 2012) ("the silence of Plaintiff's counsel at the hearing regarding the omission about which he now complains" leads to finding that "Plaintiff waived this issue by failing to raise it before the ALJ").

Based on the foregoing, I recommend that the Court decline to remand this case for further exploration of the specific DOT job codes based on Plaintiff's waiver arising from her attorney's failure to ask either VE to provide them.

**VII. Conclusion**

Based on the foregoing analysis, I recommend that Plaintiff's Motion to Reverse the Decision of the Commissioner (ECF No. 12) be DENIED and Commissioner's Motion to Affirm Her Decision (ECF No. 14) be GRANTED.

Any objection to this report and recommendation must be specific and must be served and filed with the Clerk of the Court within fourteen (14) days after its service on the objecting party. See Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d). Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district judge and the right to appeal the Court's decision. See United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).

/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
January 25, 2017